NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE DEPENDENCY AS TO S.K.

No. 1 CA-JV 25-0196

FILED 03-18-2026

Appeal from the Superior Court in Maricopa County
No. JD533241
The Honorable Marvin L. Davis, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli, Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Laura J. Huff
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Presiding Judge D. Steven Williams delivered the Court's decision, in which Judge Andrew M. Jacobs and Judge Michael S. Catlett joined.

---

**W I L L I A M S**, Judge:

¶1        Erin K. ("Mother") appeals the juvenile court's dependency order. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

¶2        Mother is the sole adoptive parent of S.K. ("Child"), born in 2016. In 2020, the Department of Child Safety ("DCS") petitioned for a dependency, but the juvenile court dismissed the petition for insufficient evidence.

¶3        In September 2025, a neighbor requested a welfare check while babysitting Child. The neighbor stated to police that Child mentioned living with several animals in the apartment, including dogs, cats, guinea pigs, and (possibly) chickens and a turkey. Police spoke to a second neighbor who stated Mother kept animals in the apartment, including aggressive dogs, and that the apartment emanated a foul odor. The second neighbor also expressed concern for Child's safety.

¶4        Standing outside of Mother's apartment, police noted "a strong foul odor of animal feces and urine." Police knocked, and Mother answered but refused to allow entrance into the apartment or to answer questions about Child. Police left to contact the apartment complex's management office. Meanwhile, Mother went to the reporting neighbor's apartment "irate" and "banging on the door and window" to retrieve Child. The neighbor phoned police, who promptly returned. Mother was "hostile and uncooperative." Police arrested Mother for disorderly conduct and child neglect.

¶5        Mother's boyfriend then gave permission for police to go inside the apartment. Once inside, they observed "animal feces and animal urine on the ground, [and] what appeared to be rotting food on the ground." DCS took custody of Child and petitioned for a dependency, alleging Mother was "unwilling or unable to provide proper and effective

parental care and control and neglected to provide a safe and stable home environment and/or proper supervision."

¶6            The juvenile court held a contested dependency adjudication hearing over two nonconsecutive days. Mother testified she did not live in the apartment, that it was her boyfriend's, and that she owned a different home, through a family trust, located in Williams. She admitted using the apartment's address to enroll Child in school, but claimed she was unaware of the apartment's condition.  She stated she was living in a short-term rental and had signed a new lease on a home in Pennsylvania.

¶7            A DCS caseworker testified that Mother refused to allow a home visit at the short-term rental because of a water leak.  The case worker also relayed difficulty in scheduling a visit at the home in Williams, and that she had not seen the Pennsylvania home lease documents. The caseworker testified Mother faced "housing instability" and opined that Mother may have "underlying mental health conditions."

¶8            Mother offered her Pennsylvania home lease as an exhibit on the second day of the hearing (held two weeks later). DCS objected, stating the lease was not timely disclosed. Child's counsel also objected, emphasizing the Pennsylvania home had not been verified, nor had DCS been able to assess whether the home was appropriate for Child. The juvenile court admitted the lease into evidence because "housing is an issue," but noted that it "would be entitled to . . . little weight."

¶9            At the close of evidence, the juvenile court found the allegations in the petition proven by a preponderance of the evidence and that Child was dependent. Over Mother's objection, the court ordered Mother to participate in the Nurturing Parent Program and submit to a psychological evaluation.

¶10            Mother timely appealed. We stayed the appeal for the juvenile court to supplement its dependency order with a "factual basis for the dependency." A.R.S. § 8-844(C)(1)(a)(ii); *see* Ariz. R.P. Juv. Ct. 338(h)(4) (explaining a finding of dependency must be supported by "specific facts"). The juvenile court complied and we lifted the stay. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 8-235, 12-120.21 and -2101(A)(1), and now address Mother's remaining arguments.

**DISCUSSION**

¶11 We review a dependency finding for an abuse of discretion. *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488, ¶ 12 (App. 2015), viewing the evidence in the light most favorable to sustaining the juvenile court's findings, *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235, ¶ 21 (App. 2005). The juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004), so we affirm its findings unless the record contains no reasonable evidence to support them, *Willie G.*, 211 Ariz. at 235, ¶ 21.

¶12 A dependent child is one adjudicated to be "[d]estitute or who is not provided with the necessities of life, including adequate food, clothing, shelter or medical care," or one "whose home is unfit by reason of . . . neglect." A.R.S. § 8-201(15)(a)(ii)–(iii). Neglect is the "inability or unwillingness of a parent . . . to provide [a] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a).

¶13 Mother contends the juvenile court's dependency finding was contrary to substantial record evidence. She argues the dispositive issue is not the apartment's condition when DCS removed Child, but whether, at the time of the dependency adjudication hearing, Mother had suitable housing for Child. Referring to the Pennsylvania home, Mother claims she secured a "presumably suitable residence for her and the child one month prior to the conclusion of the dependency adjudication hearing." But Mother did not disclose a copy of the lease to DCS until the second day of the hearing, which did not provide DCS with sufficient time to arrange a home assessment to ensure it was fit for Child.

¶14 Moreover, record evidence supported the juvenile court's finding that Mother lacked "stable, safe and sanitary" housing as outlined by A.R.S. § 8-201(15) and (25). The testimony at trial showed the apartment was not fit or sanitary for Child, and yet was the address Mother used to enroll Child in school. Mother later provided DCS with other housing information, including a short-term rental, a motel, and the home in Williams. The short-term rental agreement ended before the dependency adjudication hearing date, so DCS told Mother a case worker would instead need to conduct a "house check for her long-term residence." Later, Mother provided the address for the Williams home. DCS contacted someone living in that home who confirmed it was not Mother's permanent residence.

¶15	The juvenile court had "concerns regarding the credibility of [Mother's] testimony" about her varied housing options. This court defers to the juvenile court's credibility determinations and will not disturb any factual findings when reasonable evidence exists to support them. *See Willie G.*, 211 Ariz. at 235, ¶ 21; *Oscar O.*, 209 Ariz. at 334, ¶ 4. Mother is correct that the juvenile court must make its dependency determination "based upon the circumstances existing at the time of the adjudication hearing." *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50, ¶ 12 (App. 2016). But based on the evidence presented at the hearing, the juvenile court's finding Mother that lacked stable housing was justified.

¶16	Mother also contends that because the dependency adjudication hearing was focused on housing, and no findings about Mother's mental state or parenting abilities were made, the juvenile court's order for her to complete a psychological examination and participate in the Nurturing Parent Program was improper. Mother offers no Arizona authority limiting the juvenile court's authority to order necessary services to achieve the goal of family reunification. To be sure, except in certain aggravated circumstances, the juvenile court must order DCS "to make reasonable efforts to provide services to the child and the child's parent" when a child has been removed from the home. A.R.S. § 8-846(A).

¶17	The DCS caseworker testified Mother may have "underlying mental health conditions" that contributed to the condition of the apartment. And DCS's original petition for dependency in 2020 noted similar home conditions as existed in 2025. DCS highlighted "Mother's lack of acknowledgement" of the unsanitary housing conditions to support why a psychological evaluation and participation in the Nurturing Parent Program were necessary.

¶18	Given evidence of Mother's repeated inability to maintain a sanitary home, and the court's concerns about Mother's credibility, Mother has not shown how the juvenile court erred in ordering the psychological examination and the Nurturing Parent Program. "The primary consideration in a dependency case is always the best interest of the child. Accordingly, the juvenile court is vested with a great deal of discretion." *Ariz. Dep't of Econ. Sec. v. Superior Court*, 178 Ariz. 236, 239 (App. 1994) (citation modified).

## CONCLUSION

¶19     For the foregoing reasons, we affirm.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:          JR